UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
OLEKSANDR USACH,                        :
                         Plaintiff,     :       11 Civ. 954
                                        :          (DLC)
            -v-                         :
                                        :
ANATOLY TIKHMAN, individually and as    :
trustee of the Anatoly and Marina       :
Tickhman Living Trust U/A dated 9/15/97 :
                                        :       OPINION & ORDER
                         Defendant.     :
                                        :
----------------------------------------:
                                        :
BRAINBLUE, INC.,                        :
                         Plaintiff,     :       11 Civ. 1472
                                        :          (DLC)
            -v-                         :
                                        :
ANATOLY TIKHMAN, individually and as    :
trustee of the Anatoly and Marina       :
Tickhman Living Trust U/A dated 9/15/97 :
                                        :
                         Defendant.     :
                                        :
----------------------------------------X

APPEARANCES:

For Defendant and Counterclaimant Anatoly Tikhman:

Robert H. Stroup
Levy Ratner, P.C.
80 Eighth Avenue, Floor 8
New York, NY 10011

Thomas Craig Mundell
Mundell, Odlum & Haws, LLP
8300 Utica Avenue Suite 200
Rancho Cucamonga, CA 91730

For Plaintiff and Counterdefendant Oleksandr Usach:

Stephen Eric Tisman

James Frederick Parver
Margolis & Tisman, LLP
280 Madison Avenue, 5th Floor
New York, NY 10016

For Plaintiff and Counterdefendant Brainblue, Inc.:

Mark Walfish
Elan Richard Dobbs
Katsky Korins, LLP
605 Third Avenue
New York, NY 10158


DENISE COTE, District Judge:

     This Opinion addresses the motions to dismiss filed by the plaintiffs and counterdefendants in these related cases. Oleksandr Usach ("Usach") moves to dismiss all but the fifth counterclaim asserted in defendant and counterclaimant Anatoly Tikhman's ("Tikhman") Second Amended Answer and Counterclaims ("SACC").  Counterdefendant Brainblue, Inc. ("Brainblue") moves to dismiss both counterclaims asserted in Tikhman's First Amended Answer and Counterclaims ("FACC").  For the following reasons, both motions are granted in full.


Background

     The following facts, unless otherwise stated, are drawn from the allegations contained in Tikhman's SACC and FACC, which are substantially the same.  Tikhman resides in California. Counterdefendant Usach resides in the Ukraine.  Counterdefendant

Brainblue is a corporation formed under the laws of the British Virgin Islands and owned by Usach.

Tikhman, a Ukraine native, immigrated to the United States in 1980.  Over the succeeding decades, he founded a number of software companies, some of which were acquired by larger entities.  Sometime in the early 1990s, Usach cold-called Tikhman at the latter's home in California, identifying himself as a sub-contractor to a Russian consultant that one of Tikhman's businesses had been using.  Usach suggested that he and Tikhman work with each other directly.  Usach asserted that he could hire and train as many high-level programmers as needed to work on projects for Tikhman's businesses.

Following their initial phone conversation, Tikhman sent Usach a small programming project.  Pleased with the work done on this project, Tikhman began sending additional projects to Usach and the two men developed a "close" friendship.

Usach used a variety of entities for the various projects that Tikhman's companies hired him to handle; however, Tikhman always dealt directly with Usach in negotiating and monitoring projects.  Additionally, "Tikhman liberally extended credit" to Usach.  "Tikhman never questioned Usach's invoices or billings" and the "only hint" that "Usach was not completely straightforward in his monetary affairs" was his "aversion to paying taxes."  Usach recommended that Tikhman employ corporate

3

entities and trusts headquartered in offshore tax havens and offered to refer Tikhman to professionals who could help Tikhman arrange his personal finances in such a way as to minimize his personal tax liabilities.  Tikhman always demurred.

Over the years, Usach accrued substantial wealth. According to Tikhman, all of Usach's fortune is attributable to projects sent to him by Tikhman's businesses, or accounts and connections that Tikhman helped Usach establish.

In the spring of 2001, Tikhman and Usach had a conversation in the Ukraine regarding their future business ventures.  Usach offered Tikhman a one-half interest in any one of his programming companies if Tikhman could structure its sale. Usach would build the workforce for the company and service the company's accounts.  According to Usach, Tikhman would not share in any of the programming company's operating profits, but would own half the equity and be entitled to one-half of the consideration received upon a sale of the company.

Tikhman and Usach discussed their agreement several more times.  This oral agreement provided that Usach would create a consulting group to service accounts that Tikhman had previously brought in; that Tikhman would use his contacts with executives at technology companies to continue to generate accounts; that these accounts should be based in the U.S., in order to generate a higher price for the eventual sale of the company; and that

4

Tikhman would "pitch" the sale of the group to suitable U.S. buyers.

Usach's consulting group operated under the name Alex Usach Consulting and Technology Companies ("AUCT"), but the business was structured through a Bahamian corporation called Brainblue Holdings, Inc. ("Brainblue Holdings"), which in turn was a wholly owned subsidiary of defendant Brainblue.  After Usach finished setting up the company, Tikhman and Usach memorialized their earlier oral agreement in a stock purchase agreement ("Stock Agreement").  The Stock Agreement was backdated to reflect the date of the oral agreement.

Tikhman built up the business by bringing in accounts and several years later, he presented an acquisition proposal to Flextronics International, Ltd. ("Flextronics"), an electronics manufacturing services corporation.  After more than a year of negotiations, Flextronics acquired AUCT.  Flextronics paid an initial purchase price of approximately $3 million and agreed to pay additional contingent consideration (the "Earnout") over a five year period.  Tikhman structured the Earnout to be the more lucrative aspect of the deal.

As part of the sale of AUCT to Flextronics, Brainblue and Tikhman entered into a second stock purchase agreement ("Second Stock Agreement") dated April 30, 2004.  The Second Stock Agreement implemented Tikhman's contractual right to half of the

proceeds of the sale of AUCT to Flextronics.  Pursuant to § 1 of
the Second Stock Agreement, Brainblue agreed to

> pay [Tikhman] a purchase price . . . equal to 50% of
> the Purchase Price and 50% of the Contingent
> Consideration (as those terms are defined in the Stock
> Purchase Agreement, dated April 26, 2004) . . . by and
> among Flextronics Central Europe B.V., Brainblue
> Holdings, Inc. . . . and Brainblue, Inc.  [Brainblue]
> shall make payments to [Tikhman] promptly upon receipt
> of such payments from [Brainblue Holdings] . . . .

Flextronic's acquisition of AUCT closed in April 2004.[1]
Brainblue and Usach paid Tikhman half of the $2.7 million
received from Flextronics at the closing.  On June 5, 2005,
Usach sent Tikhman $675,000 as his half of the first Earnout
payment.  On June 5, 2006, Usach sent Tikhman $635,000 as his
half of the second Earnout payment.  Tikhman thought that the
size of the Earnout payments was "disappointing" and he asked
Usach why the payments were "less than [he] had hoped for at the
time [he] negotiated the deal."  Usach informed Tikhman that the
business had not been doing as well as anticipated.  During one
of Tikhman's visits to the Ukraine, Usach "casually" showed
Tikhman a printout of a report Usach said he was sending
Flextronics to support that year's Earnout submission.  Tikhman
believed Usach's representations regarding the Earnout figures

---

[1] According to Tikhman, notwithstanding his substantial role in
structuring Flextronics' acquisition of AUCT, "the deal on paper
was strictly between Brainblue and Flextronics."  Flextronics
was told that Usach was the sole owner of Brainblue.  It did not
know that Tikhman had an equity interest in AUCT.

for 2005 and 2006, and did not seek to independently corroborate Usach's representations.

In late 2006, Tikhman learned that Flextronics was in negotiations to sell the AUCT group that it had acquired from Brainblue to Aricent Group ("Aricent"). Tikhman expected that Usach would contact him regarding these discussions since, among other things, there were still three Earnout payments outstanding from Flextronics's acquisition of AUCT, and if Aricent purchased AUCT, it would become responsible for making those payments to Usach and Tikhman. Usach assured Tikhman that Usach would consult with Tikhman as the deal came together to ensure that they could maximize the consideration they received from the deal.

In January 2007, Tikhman hosted a dinner party at his home for Flextronics and Aricent executives. At that dinner, Tikhman mentioned that he would like to "handle" the sale of AUCT to Aricent. This prompted looks of confusion from his guests. Shortly thereafter, an Aricent executive told Tikhman that Usach had already "done the deal". Tikhman promptly confronted Usach. Usach responded: "Don't worry. I didn't steal anything. I'm going to stick with our deal. In fact, my attorneys are preparing papers to reflect the new deal I worked out on the Earnout and you will be very happy." Tikhman requested

7

documentation of the sale several times from Usach.  Usach stated that he would send the documentation, but never did.

In February 2007, Tikhman and Usach met in Paris.  At that meeting, Usach told Tikhman that the Aricent deal was for 2.5 million shares of Aricent stock plus $7 million paid over five years at $1.4 million per year.  Usach promised Tikhman that he would get his half -- $700,000 per year for five years, plus 1,250,000 shares of Aricent stock.  Usach offered to arrange for his Swiss lawyer to arrange an offshore account for Tikhman so that his earnings could be "tax-free".  Tikhman declined.

On May 23, 2007, in Zurich, Switzerland, Usach and Tikhman entered into a written agreement ("the May 2007 Agreement") regarding the cash portion of Tikhman's share of the Aricent deal.  Pursuant to the May 2007 Agreement, Usach promised to pay Tikhman $3.5 million in five annual installments of $700,000. Payments were to be made on October 15, commencing October 15, 2007.[2]

The May 2007 Agreement additionally stipulates that it "constitutes the entire and only integrated agreement between [Usach and Tikhman] and supersedes all prior discussions, negotiations, understandings and agreements, whether oral or written, between [Usach and Tikhman][.]"  It contains a broad and mutual general release of claims ("the May 2007 Release").

---

[2] A separate agreement addressed Tikhman's Aricent stock.

The May 2007 Release specifies that Tikhman releases "Usach and his affiliates, specifically including without limitation Brainblue, Inc."  It covers "any and all actions . . . claims and liabilities of every nature, known or unknown, suspected or unsuspected, arising from or related . . . to any and all prior relationships . . . and agreements, whether oral or written" that Tikhman may have against Usach.

Usach made the 2007 and 2008 payments called for in the May 2007 Agreement.  In 2009, Usach made the third installment payment minus an agreed upon offset of $361,374 to reflect monies owed to him by one of Tikhman's companies.  Usach has not made any part of the October 15, 2010 payment, nor has he contacted Tikhman to discuss the matter.

Additionally, in late 2007, after Tikhman and Usach entered the May 2007 Agreement, Tikhman learned from a friend at Flextronics that Usach (through Brainblue) had cheated Tikhman on the 2005 and 2006 Earnout payments.  Usach paid Tikhman significantly less than one half of the actual Earnout. Specifically, Usach's Earnout payment to Tikhman in 2005 "shorted" Tikhman $261,894 and the 2006 Earnout payment "shorted" Tikhman $971,800, for a total shortfall of $1,233,694. When Tikhman confronted Usach in 2008 about the breach of the Second Stock Agreement, Usach admitted to not having paid Tikhman his full share in 2005 and 2006.

Tikhman sued Usach in California state court in 2010. According to Tikhman, third-party discovery in that case revealed that Usach had not disclosed the actual amount of the consideration due to AUCT pursuant to the Flextronics/Aricent deal.  The California case was voluntarily dismissed without prejudice on September 14, 2010.

On November 8, 2010, Tikhman filed a second complaint in California Superior Court against both Usach and Brainblue.  On January 3, 2011, Usach filed suit against Tikhman in New York state court ("the Usach action"), seeking to enforce the May 2007 Release.  On January 31, Brainblue brought a similar suit against Tikhman in New York state court ("the Brainblue action").

Tikhman has removed both New York actions to federal court. Following a pretrial conference held on June 7, 2011, motions to dismiss that had been filed by Usach and Brainblue were vacated as moot, and Tikhman was given a final opportunity to amend his pleadings in both actions by July 1.  On July 1, Tikhman filed his SACC in the Usach action and his FACC in the Brainblue action.  On July 22, Usach moved to dismiss all but the fifth counterclaim in Tikhman's SACC and Brainblue moved to dismiss

both counterclaims in the FACC.[3]  Both motions became fully

submitted on August 26.


Discussion

On a motion to dismiss the court must "accept all

allegations in the complaint as true and draw all inferences in

the non-moving party's favor."  LaFaro v. New York

Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009)

(citation omitted).  The court is "not bound to accept as true

legal conclusions couched as factual allegations.  Only a

complaint that states a plausible claim for relief survives a

motion to dismiss."  Id. at 475-76 (citing Ashcroft v. Iqbal,

556 U.S. 662 (2009)).  A complaint must do more than offer

"naked assertions devoid of further factual enhancement."

Iqbal, 129 S.Ct. at 1949 (citation omitted).  In deciding a

motion to dismiss, a court may consider "any written instrument

attached to [the complaint] as an exhibit, materials

incorporated in it by reference, and documents that, although

not incorporated by reference, are integral to the complaint."

Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citation

omitted).  "Where, as in this case, certain contracts are

integral to the complaint, we also consider those documents in

_____

[3] The fifth counterclaim alleges that Usach breached the May 2007
Agreement when he failed to pay Tikhman $700,000 in October
2010.

11

deciding the merits of the motion." Interpharm, Inc. v. Wells
Fargo Bank, Nat'l Assoc., 655 F.3d 136, 141 (2d Cir. 2011).

Usach and Brainblue have asserted numerous grounds for
dismissal of all but one of Tikhman's counterclaims.  First and
foremost, however, they assert that every counterclaim but
Tikhman's fifth counterclaim in his SACC is barred by the May
2007 Release.

I.  Choice of Law

As a preliminary matter, the parties dispute whether New
York or California law governs interpretation of the May 2007
Agreement, and thus the validity, scope, and interpretation of
the May 2007 Release.  As a federal court sitting in diversity
jurisdiction, the Court is obligated "to apply the law of the
forum state in analyzing preliminary choice-of-law questions."
Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360,
365 (2d Cir. 2003) (citation omitted).  "[A]lthough [] New York
courts generally defer to the choice of law made by the parties
to a contract[,] New York law allows a court to disregard the
parties' choice when the most significant contacts with the
matter in dispute are in another state."  Id. (citation
omitted); see also Hartford Fire Ins. Co. v. Orient Overseas
Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000).

In the case of certain contracts covering high-value transactions, however, a choice of law clause selecting New York law will be honored regardless of the contacts between the state and the transaction.  General Obligations Law (GOL) § 5-1401(1) provides:

> The parties to any contract, agreement, or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate <u>not less than two hundred fifty thousand dollars</u> . . . may agree that the law of this state shall govern their rights and duties in whole or in part, <u>whether or not such contract, agreement or undertaking bears a reasonable relation to this state</u>.[4]

(emphasis added).  GOL § 5-1401(1) reflects New York public policy, consistent with New York's status as an international financial center, in favor of providing a stable body of law that sophisticated international parties may designate to structure their transactions and resolve their disputes.  <u>See Banco Nacional De México, S.A., Integrante Del Grupo Financiero Banamex v Societe Generale</u>, 34 A.D.3d 124, 130 (1st Dept. 2006). Enforcement of choice of law clauses in high-value agreements is therefore "favored since it protects the justifiable expectation of the parties who choose New York law as the governing law in international financial transactions."  <u>IRB-Brazil Resseguros</u>

---

[4] GOL § 5-1401 provides for several exceptions not relevant here.

_S.A. v. Inepar Investments, S.A._, 83 A.D.3d 573, 574 (1st Dept. 2011) (citation omitted).

The May 2007 Agreement contains a choice of law clause specifying that it will be governed by New York law.[5]  The parties to this international agreement are two experienced businessmen, one from the Ukraine and the other from California, and they have chosen that the laws of the state of New York should govern a transaction worth $3.5 million.  Under New York law, the parties' choice of law is enforced.

Tikhman does not dispute that the May 2007 Agreement contains a New York choice of law clause.  Rather, he argues that the Restatement (Second) of Conflict of Laws § 187[6] bars enforcement of the choice of law clause.  Specifically, he argues that California has a materially greater interest than New York in the resolution of this dispute, and that application

---

[5] The choice of law clause of the May 2007 Agreement reads: "Notwithstanding that neither Party hereto has a particular connection to the jurisdiction of the State of New York, the parties hereto agree that this Agreement shall be governed by and construed in accordance with the commercial laws and procedural rules of the State and Federal Courts, as appropriate, located in the State of New York, U.S.A."

[6] "The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . . application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue[.]"  Restatement (Second) of Conflict of Laws § 187(2).

of New York law would violate fundamental California public policy.

For agreements governing transactions worth more than $250,000, the parties' New York choice of law clause is enforceable "even if, under a traditional choice of law analysis, the application of the chosen law would violate a fundamental public policy of another, more interested jurisdiction." Tosapratt, LLC v. Sunset Properties, Inc., 86 A.D.3d 768, 770 (3d Dept. 2011); see also Sun Forest Corp. v. Shvili, 152 F.Supp.2d 367, 388 (S.D.N.Y. 2001) ("Section 5-1401 does not provide for any exceptions that would permit a court to decline to enforce a choice-of-law clause if the clause would infringe a fundamental public policy interest of the conflicting jurisdiction."). The May 2007 Agreement's choice of law clause will be enforced, and New York law shall govern the interpretation of its terms.

II. May 2007 Release

Usach has moved to dismiss all of Tikhman's counterclaims but the fifth counterclaim in the SACC on the grounds that they are barred by the clear terms of the May 2007 Release.[7]

---

[7] Tikhman asserts that Usach and Brainblue are barred by Fed. R. Civ. P. 12(g) from relying upon the May 2007 Release, because they did not rely upon the release in their briefing when the original motions to dismiss were submitted.  Rule 12(g) creates

Brainblue does the same with respect to both of Tikhman's counterclaims in the FACC.  The motions to dismiss on these grounds are granted.

"Under New York law . . . a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  Interpharm, 655 F.3d at 142.  "If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties."  Centro Empresarial Cempresa, S.A. v. América Móvil, S.A.B. De C.V., 17 N.Y.3d 269, 276 (N.Y. 2011) (citation omitted).  While the defendant has the initial burden of showing that it has been released from claims, "a signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress, or some other fact which will be sufficient to void the release."  Id. (citation omitted); see also Interpharm, 655 F.3d at 142.

"Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made."  Centro Empresarial, 17 N.Y.3d at 276 (citation omitted).  Where a party releases a fraud claim, it "may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release."  Id.  Full disclosure is not required for a release to

no such blanket bar.  An amended complaint "ordinarily supersedes the original and renders it of no legal effect."  Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977).

be effective, even with respect to fraud claims.  Bellefonte
Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 527 (2d Cir. 1985).
While a release may be invalidated on traditional grounds,
including duress, illegality, fraud, or mutual mistake, "[a]
release should never be converted into a starting point for
litigation except under circumstances and under rules which
would render any other result a grave injustice."  Centro
Empresarial, 17 N.Y.3d at 276 (citation omitted).

The May 2007 Release is a mutual release of claims written
in "clear and unambiguous language of remarkable breadth," see
Bellefonte, 757 F.2d at 527.  In the agreement, following
Usach's promise to pay Tikhman $3.5 million in five
installments, Tikhman commits to "unconditionally releas[ing]"
Usach and Usach's affiliates, specifically including Brainblue,
from causes of action "known or unknown, suspected or
unsuspected," arising from or relating to the parties' prior
relationship.  The provision unambiguously releases Usach from
claims arising prior to May 23, 2007, including claims alleging
fraud.  Cf. Arfa v. Zamir, 17 N.Y.3d 737, 738-39 (N.Y. 2011)
(holding release of "any and all claims . . . known or unknown"
includes fraud claims).

All counterclaims but the fifth in the SACC arise out of
events preceding May 23, 2007, and are barred by the May 2007
Release.  In the SACC, the first, second, and third claims for

17

relief allege that Usach breached the Second Stock Agreement by failing in 2005 and 2006 to pay Tikhman his full 50% share of the Earnout payments.  The fourth claim for relief alleges fraud in connection with the 2005 and 2006 Earnout shortfalls and the Aricent consideration in early 2007.  The relevant alleged misrepresentations and false statements predate the May 2007 Release.  The sixth claim for relief alleges that Usach breached fiduciary duties owed to Tikhman on the basis of an agreement entered into in 2001, which Tikhman claims established a joint venture or general partnership governed by California law.  The seventh claim alleges that Usach committed the Ukrainian tort of delict if, in the alternative, Ukrainian law governs the 2001 agreement and its consequences.[8]  The eighth claim for relief alleges fraudulent transfer in connection with the sale of AUCT by Flextronic to Aricent.  These alleged fraudulent transfers are undated, but predate February 2007.

---

[8] Both the sixth and seventh claims for relief incorporate virtually all of the allegations in the SACC.  Therefore, to the extent that the breaches underlying the sixth and seventh claims include the 2005 and 2006 Earnout shortfalls and the shortfall in the Aricent consideration, they are barred by the terms of the May 2007 Release.  To the extent that Tikhman intends to allege that Usach breached fiduciary duties originating in a 2001 oral agreement between the parties when he failed to pay Tikhman the October 2010 installment of the amount promised in the May 2007 Agreement, that claim would not be barred by the release.

The counterclaims asserted in the FACC against Brainblue echo the first and eighth claims for relief in the SACC. Both of these counterclaims are also barred by the May 2007 Release.

Tikhman principally makes three arguments why the May 2007 Release should not bar these counterclaims. In none of these arguments does he contend that any of the dismissed counterclaims fall outside the scope of the release. Rather, he attacks the release as invalid and unenforceable.

First, Tikhman argues that the doctrine of unclean hands bars Usach and Brainblue from relying upon the May 2007 Release. Unclean hands is an equitable defense to equitable claims. See, e.g., PenneCom B.V. v. Merrill Lynch & Co.,Inc., 372 F.3d 488, 493 (2d Cir. 2004); Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC, 149 F.3d 85, 89-90 (2d Cir. 1998). Under New York law, the doctrine of unclean hands may bar a party from raising an equitable defense, just as it may prevent a party from asserting an equitable claim. Matter of Uciechowski v. Ehrlich, 221 A.D.2d 866, 868 (3d Dept. 1995) (laches defense). The defense asserted by Usach and Brainblue, that the majority of Tikhman's counterclaims are barred by the May 2007 Release, arises out of a contractual right. The doctrine of unclean hands is therefore inapplicable here.

Tikhman next argues that Usach materially breached the May 2007 Agreement when he failed to pay Tikhman $700,000 as

promised in October 2010.  Tikhman therefore reasons that he should not have to honor the May 2007 Release.  "[B]efore rescission will be permitted the breach must be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Septembertide Pub., B.V. v. Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989) (citation omitted).  "If a breach is only partial, it may entitle the non-breaching party to damages for the breach, but it does not entitle him simply to treat the contract as at an end." New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006).

Tikhman does not allege that Usach failed to make the first three payments under the May 2007 Agreement.  The failure to pay Tikhman the fourth installment constitutes a partial breach. Tikhman's remedy for that breach is damages, not rescission, and performance of the May 2007 Release is not excused.

Third, Tikhman argues that the May 2007 Release must be set aside because it was procured by fraud.  If the release was induced by a "separate fraud," it may be set aside; if "[t]he fraud described in the complaint, however, falls squarely within the scope of the release," the claims remain barred. Centro Empresarial, 17 N.Y.3d at 277.  The SACC and the FACC allege, in essence, that Usach paid Tikhman substantially less than the 50%

share of sale proceeds to which he was entitled in 2005, 2006, and 2007. It is apparent from the allegations in the SACC and the FACC that by at least January 2007, Tikhman had grounds to mistrust Usach. In January 2007, Tikhman learned from an Aricent executive that Usach had negotiated Flextronics' sale of AUCT to Aricent without informing Tikhman. Soon thereafter, Tikhman negotiated the May 2007 Agreement, which was a settlement agreement entitling Tikhman to the fixed sum of $3.5 million in exchange for a release of all claims.

In two recent cases, the New York Court of Appeals has enforced broad releases under similar circumstances, where plaintiffs claimed that defendants withheld or misrepresented critical financial information to secure their agreement to a broad release of claims. See Centro Empresario, 17 N.Y.3d at 278 ("A sophisticated principal is able to release its fiduciary from claims -- at least where, as here, the fiduciary relationship is no longer one of unquestioning trust -- so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into[.]")[9]; Arfa, 17 N.Y.3d at 739 ("By their own admission, plaintiffs, who

---

[9] Tikhman tries to distinguish Centro Empresarial by arguing that that case involved corporations represented by counsel. But Tikhman, as the SACC and FACC make clear, was a very sophisticated businessman, and the May 2007 Agreement itself states that it was negotiated with representation by counsel on both sides.

are sophisticated parties, had ample indication prior to [the release date] that defendant was not trustworthy, yet they elected to release him from the very claims they now bring without investigating the extent of his alleged misconduct."). Tikhman is a sophisticated businessman.  He had ample grounds to mistrust his business partner, and decided to settle for a sum certain and future payments of fixed amounts rather than trust to receive a percentage of future earnings.  Having done so, Tikhman cannot now bring suit on the basis of claims that fall squarely within the scope of the May 2007 Release.

Conclusion

Usach's July 22 motion to dismiss all of Tikhman's counterclaims in the SACC except the fifth counterclaim for breach of the May 2007 Agreement is granted.  Brainblue's July 22 motion to dismiss both of the counterclaims in the FACC is granted.

SO ORDERED:

Dated:    New York, New York
          December 7, 2011


                              _____
                              DENISE COTE
                    United States District Judge


22